**UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS
BOSTON DIVISION**

UNITED STATES OF AMERICA

    v.

BAY STATE GAS COMPANY, d/b/a
Columbia Gas of Massachusetts,

             Defendant.

Case No. 20-cr-10066-FDS

**SENTENCING MEMORANDUM OF DEFENDANT BAY STATE GAS COMPANY,
D/B/A COLUMBIA GAS OF MASSACHUSETTS**

Defendant Bay State Gas Company, d/b/a Columbia Gas of Massachusetts ("CMA"),

respectfully submits this memorandum in support of the sentencing terms upon which CMA and

the United States Attorney's Office for the District of Massachusetts (the "Government") have

agreed.  The parties' agreed-upon sentencing terms are set forth in their Plea Agreement pursuant

to Fed. R. Crim. P. 11(c)(1)(C).  A copy of the Plea Agreement is attached as Exhibit A to the

Declaration of Kim Cuccia ("Cuccia Declaration") for ease of reference.  On March 9, 2020,

CMA entered its guilty plea pursuant to the Plea Agreement.  This Court accepted CMA's plea.

## I.        INTRODUCTION

The facts of this case are well known to this Court and to the public.  On September 13,

2018, a series of fires and explosions resulted from an over-pressurization event during a

pipeline replacement project that CMA was performing in Lawrence, Massachusetts.  The fires

and explosions tragically resulted in the death of one individual and serious injury to another,

injuries to 22 additional people, damage to approximately 131 residential and commercial

structures, and natural gas service outages for nearly 10,000 customers in Andover, Lawrence,

and North Andover, Massachusetts.

Following the incident, CMA swiftly accepted responsibility for the event and began to

make affected individuals, businesses, and the communities whole.  CMA and its parent

company, NiSource Inc. ("NiSource"), immediately established a claims process to reimburse

individuals and businesses for their losses; arranged temporary housing, meal allowances,

transportation, and alternative appliances for the fully or partially displaced; and stood up claims

centers and multi-lingual communication channels to reach those affected.  CMA and NiSource

paid more than $820 million in claims through this voluntary process and in the provision of

these other remedial services.  Declaration of Donald E. Brown ("Brown Declaration") ¶ 3.

CMA engaged cooperatively and transparently with government investigations and legal proceedings.  It engaged with stakeholders to enhance the safety of its system and to help prevent something similar from happening again.  CMA cooperated with the National Transportation Safety Board's investigation and embraced the agency's safety recommendations, prompting the Chairman to comment publicly on CMA's model response.  Cuccia Declaration at ¶ 3. Similarly, CMA did not undertake a battle-focused approach to the many civil cases brought against it, but instead worked tirelessly to resolve them.  It is now less than two years since the September 2018 event and the class actions have been settled with court approval and payments to class members have begun, the wrongful death and serious personal injury lawsuits have been settled, and only a few other personal injury claims remain.  CMA also reached a settlement with the three affected municipalities of Lawrence, Andover, and North Andover.  Cuccia Declaration at ¶ 5.

The company's approach to the Government's criminal investigation has been no different.  In a highly technical investigation of natural gas pipeline operations, CMA produced hundreds of thousands of documents, facilitated witness interviews, and otherwise cooperated fully with the Government's investigation.  CMA ultimately resolved the criminal case, culminating in the Plea Agreement that is now before this Court.  Within 18 months of the event, CMA entered its plea to a single felony count violation of the Natural Gas Pipeline Safety Act and agreed to the carefully negotiated and complex terms of its Plea Agreement with the Government.  In fact, CMA has already taken steps in furtherance of the Plea Agreement that it and the Government together consider in the public's interest and a critical component of the

company's commitment to safety:  CMA has moved forward with the selection and on-boarding

of a monitor pursuant to paragraph 5(c)(ii) of the Plea Agreement.  Cuccia Declaration at ¶ 6.[1]

## II.     THE PLEA AGREEMENT

The Plea Agreement between the Government and CMA is the culmination of

negotiations that involved unique, dynamic, and challenging issues.  The resolution of CMA's

criminal liability for the September 2018 event was tied to the negotiation and finalization of the

Government's Deferred Prosecution Agreement with NiSource.  Plea Agreement at ¶ 6.  In

addition to CMA's prompt acceptance of responsibility for the offense of conviction and its

voluntary payments of restitution to the victims, a key underpinning of the Plea Agreement

included NiSource's commitment to use reasonable best efforts to sell CMA or its gas

distribution business to a qualified third-party buyer.  Plea Agreement at ¶ 4.  The Government

and CMA agreed to a formula for the calculation of profit or loss from a sale of CMA or its gas

distribution business, and agreed that any profit from a sale would be forfeited to the

Government.  Plea Agreement at ¶¶ 4, 5(c)(iii).[2]  Moreover, the United States Sentencing

Guidelines do not provide a guideline for the Natural Gas Pipeline Safety Act violation to which

CMA pled guilty, *see* Plea Agreement at ¶ 4(g), and the calculation of loss was especially

challenging because CMA's voluntary payment of claims, contributions, and settlements could

not serve as an accurate measure.

CMA is cognizant of the reasons why plea agreements under Rule 11(c)(1)(C) are to be

used sparingly.  CMA respectfully submits that this case is appropriate for such a plea agreement

---

[1]  CMA is addressing ongoing, overlapping investigations by the Massachusetts Department of Public Utilities and the Massachusetts Attorney General's Office in the very same spirit: with the goal of resolving the investigations as fairly and swiftly as possible.

[2]  Subsequent to the announcement of the Plea Agreement, NiSource announced a sale of CMA's gas distribution business.  NiSource has demonstrated to the Government and the Court that NiSource will not make a profit from the sale.

given the unique, dynamic, and challenging issues involved.  CMA explains below, for the

Court's consideration, why the parties' agreed-upon resolution achieves justice in this matter.

## III.     THE PARTIES' PLEA AGREEMENT RESULTS IN A FAIR AND JUST OUTCOME

The parties' Plea Agreement includes many traditional terms that are not specific to this

case.  *See, e.g.*, Plea Agreement at ¶ 4 (conditions under which the Government may be released

from its commitments under the Plea Agreement); Plea Agreement at ¶ 7 (CMA's waiver of right

to appeal).  Rather than summarize and present the justification for each term of the Plea

Agreement, CMA respectfully draws this Court's attention to the three terms that are tailored to

the specific facts of this case and as to which the Court would most likely benefit from learning

of the parties' reasoning for them.  The three terms focus on restitution, the amount of the

criminal fine, and the customized and unique conditions of probation.

### A.     CMA Has Paid Full Restitution In This Case

CMA and its parent NiSource have paid more than $1 billion to the residents and

businesses affected by the September 2018 event.  The more than $1 billion has been paid

through different processes and for the diverse range of reasons required to make the victims and

affected individuals and entities whole, including, for example, through (1) the provision of

temporary housing, transportation, meal, and other living expenses of victims immediately

following the event; (2) the voluntary payment of individual and business claims for such

expenses and the payment of damages, achieved through a claims process that CMA developed

and executed swiftly outside of any court process; (3) the settlement of civil litigation, including

class actions and individual personal injury actions[3]; (4) the repair and replacement of appliances

and other equipment; (5) the settlement with the three affected municipalities; and (6) the

---

[3] There are a few individual personal injury claims that remain, as to which CMA is seeking a resolution.

establishment of funds for the benefit of the affected communities and their residents.  Brown

Declaration at ¶ 3; Cuccia Declaration at ¶¶ 4-5.

In recognition of CMA's payment of full restitution, the parties' Plea Agreement does not

include a provision for any such payment.  In fact, the U.S. Attorney deemed CMA's voluntary

payment of full restitution a material reason for the agreed-upon disposition of this case:

> The U.S. Attorney's agreement that the disposition set forth below is appropriate
> in this case is based, in part, on Defendant's prompt acceptance of responsibility
> for the offense of conviction in this case [and] Defendant's voluntary payments of
> restitution to the victims of the offense. . . .

Plea Agreement at ¶ 4.  When the parties represented this fact to this Court during the March 9,

2020 Rule 11 plea hearing, the Court inquired whether the Superior Court for the

Commonwealth of Massachusetts had approved the settlement of the class action against CMA.

It had not.  However, three days later, on March 12, 2020, the Superior Court approved the

settlement and rendered the final judgment in the class action.  Cuccia Declaration Exhibit B

(Final Judgment, *In Re: Columbia Gas Cases* (Mass. Super. Ct.)).

### B.      The Imposition Of The Agreed-Upon Criminal Fine Is Warranted

The Government and CMA have agreed to the United States Sentencing Guidelines (the

"Guidelines" or the "USSG") calculations applicable in this case, and to the legal and factual

analysis that led to the agreed-upon and severe criminal fine of $53,030,116.

The Guidelines calculations are set forth in paragraph 4 of the Plea Agreement.  CMA

has pled guilty to a single-count Information charging it with a violation of the Natural Gas

Pipeline Safety Act (the "Act"), 49 U.S.C. §§ 60123(a) and 60118(a) and 49 C.F.R.

§§ 192.605(a) and 192.605(b)(5).  The Guidelines do not identify a specific guideline for a

violation of the Act.  As such, this Court should apply the guideline for the "most analogous

offense."  *See* USSG § 2X5.1.  Federal prosecutions under the Act are rare.  In fact, the only

precedent the parties identified was the federal prosecution of Pacific Gas & Electric Company

in California.  United States' Sentencing Memorandum at 6, *United States v. Pacific Gas & Elec.*

*Co.*, No. 14-CR-00175 (N.D. Cal. Jan. 9, 2017), ECF No. 905 (describing USSG § 2Q1.2 and

stating that the government "concur[red] with the sentencing calculation set forth in the revised

PSR"); Transcript of Sentencing Hearing at 7:9-10, *United States v. Pacific Gas & Elec. Co.*, No.

14-CR-00175 (N.D. Cal. Jan. 23, 2017), ECF No. 923 (the court "agree[d] with the presentence

report's calculation of the advisory guidelines range").  The parties agree that USSG § 2Q1.2, as

it pertains to the Mishandling of Hazardous or Toxic Substances, is the guideline applicable to

the most analogous offense.  Plea Agreement at ¶ 4(b).  USSG § 2Q1.2 provides for a base

offense level of 8.  The remaining calculations under the Guidelines are, as set forth in the Plea

Agreement, as follows:

- CMA's offense level is increased by 6 levels because, pursuant to USSG
  § 2Q1.2(b)(1)(A), the offense resulted in, by analogy, an ongoing and continuous
  discharge of natural gas;

- CMA's offense level is increased by 9 levels because, pursuant to USSG
  § 2Q1.2(b)(2), the offense resulted in a substantial likelihood of death and serious
  bodily injury[4];

- In accordance with USSG § 3E1.1, based on CMA's prompt acceptance of
  responsibility for the offense of conviction in this case, the adjusted offense level is
  reduced by three, resulting in a total adjusted offense level of 20.

*See* Plea Agreement at ¶ 4.  USSG § 8C2.1 governs the applicability of the fine guidelines.

Because USSG § 2Q1.2—the most analogous offense guideline applicable to this case—is not

---

[4] In fact, the September 2018 event led to, among other losses and injuries, the death of Mr. Leonel Rondon and the serious bodily injury of Ms. Shakira Figueroa.  Cuccia Declaration at ¶ 4.

covered by USSG § 8C2.1, the Guidelines provide that the court "should determine an

appropriate fine by applying the provisions of 18 U.S.C. §§ 3553 and 3572." *See* USSG

§ 8C2.10; Plea Agreement at ¶ 4.

Pursuant to 18 U.S.C. § 3571(d), the maximum fine that can be imposed upon CMA is no

more than the greater of twice the gross gain or twice the gross loss resulting from the offense

conduct. Sections 3553 and 3572 of Title 18 of the United States Code identify factors that the

Court can consider in determining the amount of the criminal fine to be imposed. Such factors

include, for example, the history and characteristics of the defendant, the seriousness of the

offense, the need to adequately deter future criminal conduct, and the need to provide restitution

to any victims of the offense.

Though CMA's felony offense is its first, the Government nevertheless pursued a severe

criminal fine against the company primarily because of the seriousness of the offense and the

need to deter such future conduct. Calculation of the loss amount proved too difficult; voluntary

claims paid, settlement amounts, and contributions to local community causes are woefully

imprecise measures. *See, e.g.*, Order Granting In Part Defendant's Motion to Dismiss the

Alternative Fines Act Sentencing Allegations, *United States v. Pacific Gas & Elec. Co.*, No. 14-

CR-00175 (N.D. Cal. Dec. 8, 2015), ECF No. 201 (government's inability at trial to use

settlement amounts as the measure of loss led the government to seek formulaic statutory

penalties); *see also* USSG § 8C2.4 ("to the extent the calculation of . . . pecuniary loss would

unduly complicate or prolong the sentencing process, that amount . . . shall not be used for the

determination of the base fine"). Moreover, using the more than $1 billion that CMA paid in

voluntary claims, settlements, and contributions as a measure of loss would lead to a grossly

aberrational fine amount, one that is neither tethered to the fines imposed in analogous cases or one that accounts for the extraordinary amount of restitution CMA already has paid.

One of the critical objectives in imposing a sentence is to avoid disparity in sentences imposed. 18 U.S.C. § 3553(a)(6) (factors to be considered in imposing a sentence include "the need to avoid unwarranted sentence disparities"). In 2017, Black Elk Energy Offshore Operations LLC pled guilty to eight felony violations of the Outer Continental Shelf Lands Act and one misdemeanor violation of the Clean Water Act after a 2012 explosion on the company's production platform resulted in the death of three workers and injuries to others. The court imposed a $4.2 million criminal fine. Judgment, *United States v. Black Elk Energy Offshore Operations, L.L.C.*, No. 2:15-cr-00197-JTM-KWR (E.D. La. Aug. 31, 2017), ECF No. 307. In 2016, KTX Ltd. pled guilty to criminal violations of the Clean Air Act for releasing hazardous air pollutants after a plant explosion. The explosion killed one worker and severely injured two others. Factual Basis, *United States v. KTX Ltd.*, No. 1:16-cr-00075 (E.D. Tex. Oct. 12, 2016), ECF No. 23. The court imposed a $3.3 million criminal fine and ordered a $200,000 community service payment. Judgment, *United States v. KTX Ltd.,* No. 1:16-cr-00075 (E.D. Tex. Oct. 13, 2016), ECF No. 39. In 1996, Iroquois Pipeline Operating Company ("Iroquois") pled guilty to criminal violations of the Clean Water Act that stemmed from the company's construction of a gas pipeline. Iroquois agreed to a criminal fine of $15 million, in addition to other monetary penalties. *See Builder of Vast Northeastern Gas Pipeline Pleads Guilty, Will Pay $22 Million in Criminal & Civil Fines*, Dept. of Justice (May 23, 1996), *available at* https://www.justice.gov/archive/opa/pr/1996/May96/233.enr.htm. In one of the most egregious cases, in 2010, British Petroleum agreed to a criminal fine of approximately $50 million for a 2005 explosion at its Texas City refinery that caused the death of 15 people and injured 170

others.  Plea Agreement at ¶ 1(b), *United States v. BP Prods. N. Am. Inc.*, No. 4:07-cr-434 (Mar. 12, 2009), ECF No. 126.

The United States Supreme Court has suggested that a company's restitution payments can be considered as a basis for reducing the amount of the criminal fine imposed.  *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 479 (2008) (recognizing the $100 million in restitution paid to the victims of the Exxon Valdez oil spill).  Thus, taking CMA's restitution amounts into consideration, the criminal fines imposed in analogous cases, and the law's overarching goal of avoiding sentencing disparity, the agreed-upon criminal fine of $53,030,116 in this case is severe.  It represents twice the amount of pecuniary gain of $26,515,058 that CMA received from its Gas System Enhancement Plan ("GSEP") in Massachusetts from 2015 through and including 2018.  *See* Plea Agreement at ¶ 5(a).

Under Massachusetts law, gas utility companies like CMA have a financial incentive to replace or improve aging or leaking gas infrastructure.  *See* M.G.L. c. 164 § 145.  In broad terms, § 145 allows a gas utility to create a GSEP to recover, through the rates it charges its customers, the capital costs associated with its pipeline replacement work.  In this case, the pipeline replacement project that led to the September 2018 event was part of CMA's GSEP.  Brown Declaration at ¶ 4.

CMA submitted its first GSEP in 2014 to begin recovering costs in 2015.  From 2015 to 2018, CMA realized a total pecuniary gain of $26,515,058 from the pipeline replacement work it performed pursuant to its GSEP.  Brown Declaration at ¶ 5.  The criminal fine of $53,030,116 represents twice the amount of profit CMA realized from its GSEP work throughout that time period.  While the nexus between the September 2018 event and CMA's earnings from its GSEP

throughout Massachusetts during the 2015-2018 time period is arguable, CMA agreed to this calculation and the resulting criminal fine amount to resolve this case.

**C.      The Unique Terms Of The Plea Agreement, Including Certain Conditions Of Probation, Justify The Rule 11(c)(1)(C) Plea And Are Fair**

The Plea Agreement includes unique and significant terms that not only involve the Government and CMA, but also involve CMA's parent, NiSource.  These terms, some of which are included in CMA's period of probation, are complicated and the result of the parties' careful consideration of a myriad of factors.  Those factors include the public benefit that would be served by transferring ownership of CMA's gas distribution business, and the conclusion that justice would be served by the Government's agreement not to pursue a prosecution of NiSource.

One of the underpinnings of the Plea Agreement is NiSource's agreement to (1) use reasonable best efforts to sell CMA or its gas distribution business to a qualified third-party buyer, (2) cease its gas pipeline and distribution activities in Massachusetts upon the completion of the sale, and (3) forfeit any profit or gain it realizes from the sale.  *See* Plea Agreement at ¶ 4.[5] The agreed-upon conditions of CMA's probation include provisions addressing such a sale and the obligations that arise both before and after it.  *Id.* at ¶ 5(c).  The agreed-upon three-year period of probation, which is the maximum allowed by statute (*see* 18 U.S.C. § 3561(c)(1)), is to terminate early if the sale is consummated prior to the expiration of the three-year probationary term.  Plea Agreement at ¶ 5(b).

The unique probationary conditions also include CMA's agreement to implement and adhere to the recommendations that the National Transportation Safety Board ("NTSB") issued as a result of the NTSB's own investigation of the September 2018 event, Plea Agreement at

---

[5] CMA has submitted evidence to the Government and this Court reflecting the fact that no profit or gain is expected from the sale.  *See supra* n.2.

¶ 5(c)(i), and the somewhat more common condition that CMA employ at its expense a monitor to oversee its compliance with the NTSB's recommendations and applicable laws and regulations. *Id.* at ¶ 5(c)(ii).  CMA has already selected and engaged the monitor.  Cuccia Declaration at ¶ 6.  Critically, the Plea Agreement also is expressly contingent upon the Government's Deferred Prosecution Agreement with NiSource and NiSource's compliance with the DPA's terms.  Plea Agreement at ¶ 6.

These unique terms reflect a complex agreement between the parties that, overall, achieves the best outcome for the Commonwealth of Massachusetts, including the customers and communities that CMA serves.  Given the uniqueness of the Plea Agreement's terms and the complexity of the overall resolution, the parties considered a Rule 11(c)(1)(C) plea agreement to be justified and appropriate in this case.

## IV.   CONCLUSION

For the foregoing reasons, CMA respectfully requests that the Court accept the parties' Rule 11(c)(1)(C) Plea Agreement and impose the sentence set forth in it.

Dated: June 2, 2020                     Respectfully submitted,

*/s/ Alejandro N. Mayorkas*
Alejandro N. Mayorkas (*pro hac vice*)
WILMER CUTLER PICKERING
  HALE AND DORR LLP
1875 Pennsylvania Ave. NW
Washington, D.C. 20006
Tel: (202) 663-6221
Fax: (202) 663-6363
alejandro.mayorkas@wilmerhale.com

Emily R. Schulman (BBO #450486)
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street
Boston, MA 02109

- 11 -

Tel: (617) 526-6077
Fax: (617) 526-5000
emily.schulman@wilmerhale.com

*Counsel for Defendant Bay State Gas Company*
*(d/b/a Columbia Gas of Massachusetts)*