# Monthly Report

*to the*

# Committee

---

## *July 2020*



*From the*
**Court-Appointed Monitor**
*for*
**Columbia Gas of Massachusetts**

**Submitted July 29, 2020**

*United States v. Bay State Gas Company, d/b/a Columbia Gas of Massachusetts*
*(Docket: 20-cr-10066-FDS)*

*Monthly Report of the Independent Monitor for Columbia Gas of Massachusetts*

*July 2020*

# Executive Summary

Pursuant to a plea agreement in the matter of *United States v. Bay State Gas Company d/b/a Columbia Gas of Massachusetts (CMA)*, the Court appointed Monitor (James E. Hall of Hall & Associates LLC) submits this first monthly report to the Court-designated government committee. The plea agreement, in part, requires an independent monitor to oversee CMA's compliance with five NTSB recommendations issued to CMA's parent company, NiSource, from its investigation of a fatal gas pipeline accident in the Merrimack Valley on September 13, 2018. The Monitor was also tasked with overseeing compliance with the applicable Federal and state laws and rules associated with the five recommendations, as well as CMA's safety culture and other aspects.

**CMA is a Company in Transition:** CMA is currently experiencing significant change and uncertainty that has the potential of increasing its exposure to risk. The aftermath of the Merrimack Valley accident followed by court actions, the planned separation from NiSource and the Covid-19 pandemic are likely contributing to an environment of uncertainty and distraction. The Monitor team remains vigilant to this environment as it conducts its work. In fact, the progress of the Monitor team is also challenged by some of these same aspects, but in differing ways as explained below.

**Progress and Challenges of the Monitor's Work:** The Monitor began its work in late April in advance of, and in preparation for, its tasking by the Court which approved the Monitor on June 23, 2020 and accepted the Monitor's Work Plan three days later. The Monitor has since reviewed over 10,000 pages of documents and conducted 14 structured interviews of CMA and NiSource executives and managers. Interviews are now being scheduled with the "rank and file" who are implementing the leadership's policies and vision at the front lines of CMA's services.  However, a number of factors are complicating the Monitor's work, such as the quandary posed by the Court's tasking to assess CMA's compliance with recommendations that in fact were issued to NiSource. A considerable amount of time has been expended to fully grasp the interrelationships, leadership responsibilities and organizational processes that are shared between CMA and NiSource and how they impact safety. Exacerbating this challenge is the inability to conduct on-site observations due to the Covid-19 pandemic and DPU-issued stop-work orders that have significantly reduced opportunities to monitor CMA work and communicate directly with their workforce. Despite these challenges, the Monitor team has made good progress with identifying specific CMA activities to audit as well as potential areas of concern that will be explored with greater detail in later reports.

**Status of Assessment of NTSB Recommendations:** Four of the NTSB recommendations were issued to NiSource on November 15, 2018 and classified as "urgent." The Monitor notes that all four have since been closed by the NTSB as "acceptable" by virtue of NiSource correspondence and information that the NTSB did not verify or validate. The NTSB also issued a fifth recommendation on October 24, 2019; its status remains "Open-Acceptable Response." In brief, the Monitor's progress and observations related to the recommendations are as follows:

- P-18-006: (*Constructability Reviews/PE Stamp*) - The Monitor has requested work activity documents from CMA and is currently identifying specific ongoing capital and maintenance activities, as well as incident responses to review company records and validate compliance.

- P-18-007: *(Documentation is Traceable, Reliable and Complete)* – The focus of NiSource for this recommendation – with apparent concurrence by NTSB -- has been on the sensor lines of the low pressure regulator stations. However, recent issues have been found with inaccuracies and incompletions with other drawings and documentation.  The Monitor is continuing to pursue this issue.

- P-18-008: *(Management of Change (MOC) Process)* – At this early stage, the Monitor has not yet identified a written MOC procedure by NiSource or CMA, or a specific office/official responsible for the management of such a procedure. The Monitor will continue to seek documentation of the application of a formal MOC process for CMA changes of technology, equipment, procedures and organization as per API Recommended Practice 1173 (SMS).

- P-18-009: *(Control Procedures & Gas Pressure Monitoring)* – This recommendation is closely tied to P-18-008 above. The Monitor will also review recent gas release incidents such as the one on July 9, 2020 in Lawrence that occurred while a contractor was excavating. The Monitor team will also seek to understand the process by which CMA evaluates risk.

- P-19-018: *(Emergency Response Planning)* - CMA/NiSource submitted an updated and improved Emergency Preparedness and Response Plan (EPRP) to the DPU on May 15, 2020. The Monitor is evaluating this documentation and will soon begin interviewing employees and contractors involved in recent incidents to verify compliance with the EPRP.

**Safety Culture and Safety Management Systems (SMS):** The Monitor team has reached consensus on initial areas of concern related to safety culture and SMS implementation that are based on its review of requested documents and interview responses. These areas include the following:

- Leadership. A disconnect may exist between what NiSource leadership says and what CMA management hears, understands and implements. This area relates directly to Safety Culture, the integration of SMS into processes, and the alignment between the leadership's safety performance goals and activities with respect to compensation.

- Completion of Work Documentation. Adequate written processes and company standards generally exist at CMA to perform required tasks; however, as indicated in recent DPU correspondence and CMA after-action reports, required documentation for certain tasks is not being completed in some cases. This challenge became evident in recent work performed in areas involving mark and locate, operator qualification, regulator station drawings and liquid natural gas processes. Incomplete paperwork in and of itself can create significant safety hazards and be an indicator of a deficient safety culture.

- Benchmarking Safety. Trailing safety metrics and benchmarks tell a story of safety as viewed in the rear-view mirror. In CMA's case, the safety performance of employees and contractors since the Merrimack Valley accident in 2018 has not been in the top quartile. While NiSource and CMA emphasize forward-looking safety metrics to drive improvement, trailing metrics should continue to play an important role to understand where the company has been, where it is now, and where it wants to be in the future.

- SMS Implementation. The NiSource SMS Standard was published in October 2019 and conforms to API Recommended Practice 1173. The Monitor team has focused on the understanding and application of the elements, processes and programs required for successful implementation of SMS by CMA. Although many groups and individuals have been assigned activities under the umbrella of SMS, the level of understanding, execution and integration of these processes does not appear to be uniformly understood.

The Monitor team acknowledges the good cooperation it has received to date from CMA and NiSource. Greater consideration of empirical data, key observations and/or recommendations will be presented in future reports as documentation review and site visits are conducted.

# Table of Contents

**1.0 Introduction** …………………………………………………………………..……… 1

**2.0 Background** …………………………………………………………………..……… 1

**3.0 Columbia Gas of Massachusetts: A Company in Transition** …………………………… 2

**4.0 Scope of Monitor's Work** ……………………………………………….....…………… 3

**5.0 Activities Conducted by the Monitor** ………………………………………………… 4

    5.1 Preparation Prior to the Work Plan Effectivity………………………… 4

    5.2 Work Plan Activities Conducted to Date ……………………………… 5

        5.2.1 Methodologies Employed
        5.2.2 Documents and External Reports Reviewed
        5.2.3 Interviews Conducted

    5.3 Recent Safety-Related Events Under Review by Monitor ……………. 7

**6.0 Assessment and Observations of Monitor's Work to Date** ……………………………..   8

    6.1 Compliance with NTSB Safety Recommendations …………….……… 8
        6.1.1 Rec. No. P-18-006: *Constructability Reviews / PE Stamp*
        6.1.2 Rec. No. P-18-007: *Documentation is Traceable, Reliable and Complete*
        6.1.3 Rec. No. P-18-008: *Management of Change Process*
        6.1.4 Rec. No. P-18-009: *Control Procedures & Gas Pressure Monitoring*
        6.1.5 Rec. No. P-19-018: *Emergency Response Planning*

    6.2 Compliance with Applicable Laws and Rules ………………………… 12

    6.3 Safety Culture …………………………………………………………12

**7.0  Moving Forward: Planned Activities for Monitor Team** ……………………………….. 14

    **Appendix:**  Biographies of Monitor Team

# Monthly Report
*of the*
# Court-Appointed Monitor
## for Columbia Gas of Massachusetts

## ---- July 2020 ---

Submitted July 28, 2020

## 1.0 Introduction

Pursuant to the Monitor Agreement in the matter of *United States v. Bay State Gas Company, d/b/a Columbia Gas of Massachusetts (Docket: 20-cr-10066-FDS)*, the Court Appointed Monitor ("Monitor") submits this first Monthly Report for the month of July in 2020.

## 2.0 Background

On September 13, 2018, a series of structure fires and explosions occurred after high-pressure natural gas was released into a low-pressure natural gas distribution system in the northeast region of the Merrimack Valley in the Commonwealth of Massachusetts ("Merrimack Valley accident"). One person was killed, 22 were injured and 131 structures were damaged in the city of Lawrence and the towns of Andover and North Andover. The natural gas distribution system is owned and operated by Columbia Gas of Massachusetts (CMA), a subsidiary of NiSource, Inc. CMA delivers natural gas to about 325,000 customers in Massachusetts.

The National Transportation Safety Board (NTSB) investigated the accident and issued a final report with recommendations.[1] Additionally, the U.S. Attorney for the District of Massachusetts pursued criminal charges. CMA agreed to plead guilty to violating a minimum safety standard of the *Natural Gas Pipeline Safety Act* relating to the failure to implement procedures to prevent the over-pressurization. CMA agreed to accept responsibility for the Merrimack Valley accident. The U.S. Attorney entered into the Plea Agreement with CMA on February 25, 2020, which, among other things, requires CMA to employ at its expense an independent monitor to oversee its compliance with five NTSB recommendations (discussed in section 6.1 of this report) -- issued from its Merrimack Valley investigation -- and also to monitor compliance with the "applicable laws and regulations" related to the issues addressed in the recommendations.

The Plea Agreement requires a monitor to report monthly[2] in writing to a government committee ("Committee") composed of a representative from the U.S. Attorney's Office, the Massachusetts Department of Public Utilities (DPU), and the Massachusetts Attorney General's Office  during a three-year probation period, or until CMA's assets are sold by NiSource.[3]

---

[1] NTSB Pipeline Accident Report NTSB/PAR-19/02, *"Overpressurization of Natural Gas Distribution System, Explosions, and Fires in Merrimack Valley, Massachusetts, September 13, 2018."* Adopted September 24, 2019. https://www.ntsb.gov/investigations/AccidentReports/Reports/PAR1902.pdf

[2] A minimum of three reports will be issued during the period of this Work Plan which contemplates the sale of the company as early as September 30, 2020.  If the company is not sold at that time, the Monitor will continue to issue monthly reports until either the completion of the sale of CMA or the end of the probation period.

[3] As a part of the Plea Agreement, NiSource agreed to sell the assets of CMA to another company, Eversource Energy, in accordance with an asset purchase agreement that contemplates the sale by September 30, 2020.

In late April of 2020, CMA requested James E. Hall of Hall & Associates LLC (see Appendix A for biographies) to begin its monitoring duties in advance of, and in preparation for, a Monitor Agreement between Hall, CMA, and the U.S. Attorney. The Monitor Agreement became effective on May 27, 2020 and required that the Monitor develop a work plan within 30 days that would govern the manner in which its oversight will occur. The Court approved the Monitor at sentencing hearing on June 23, 2020. On June 26, 2020, the Monitor submitted its first Semiannual Work Plan to the Court.[4]

## 3.0 Columbia Gas of Massachusetts: A Company in Transition

CMA employs about 700 people and delivers natural gas to over 320,000 customers in southeastern Massachusetts, the greater Springfield area and the Merrimack Valley. Headquartered in Westborough, Massachusetts, the company is the largest gas-only provider in the state. Currently, CMA is owned by NiSource, Inc., an Indiana-based company with approximately 8,000 employees across its service area. NiSource's principal subsidiaries include a natural gas distribution holding company, _and_ a separate gas and electric company that transmits and distributes electricity to approximately 469,000 customers in Indiana.[5] NiSource's natural gas operations comprise about 60,000 miles of pipeline and include 732 low-pressure natural gas distribution systems across six gas distribution subsidiaries that provide natural gas under the local Columbia Gas brand to approximately 2.6 million customers in Kentucky, Maryland, Massachusetts, Ohio, Pennsylvania and Virginia.

CMA is currently experiencing a significant amount of change and uncertainty that the Monitor team believes has the potential of increasing its exposure to risk.. This  change began with the Merrimack Valley accident in September 2018 and continued through the accident's aftermath of Congressional hearings, increased media coverage, Federal and state investigations, and criminal prosecution. Even as its restoration efforts eventually ameliorated the damage from the accident, CMA continues to experience additional change and uncertainty through court actions and the Covid-19 pandemic.

Additionally, as a result of its Plea Agreement, and through a recently announced Joint Petition/Settlement Agreement, CMA is transitioning away from NiSource's control to be sold to another company -- Eversource Energy.[6]  The transaction is expected to be completed as early as October 1, 2020.[7]  The CMA workforce involves six separate employee union contracts, four of which are currently under negotiation with Eversource. This impending transition is being carefully considered by the Monitor team as it remains vigilant to indications of stress, distraction and complacency that could present hazards to CMA's day-to-day operations.

---

[4] Article 1, Paragraph 1.1 of the Monitor Agreement states, in part that the Monitor "… shall develop its work plan, in consultation with the U.S. Attorney's Office and CMA, within thirty (30) days of the full execution of this Agreement…. The Monitor may from time to time revise the workplan, in consultation with the U.S. Attorney's Office and CMA, based upon what it learns and however it deems best to fulfill its responsibilities under this Agreement."

[5] NiSource is the successor to an Indiana corporation organized in 1987 under the name of NIPSCO Industries, Inc., which changed its name to NiSource on April 14, 1999.

[6] Under the terms of the agreement, Eversource will acquire substantially (with some exceptions) all of the assets of CMA, a wholly-owned subsidiary of NiSource, and all of the assets held by any of CMA's affiliates that primarily relate to the business of storing, distributing or transporting natural gas to residential, commercial and industrial customers in Massachusetts, as conducted by CMA. Eversource also agreed to assume certain liabilities of CMA and its affiliates..

[7] Eversource is New England's largest energy delivery company serving approximately 4 million customers in Connecticut, Massachusetts and New Hampshire. Once it acquires the assets of CMA, Eversource will serve 626,000 natural gas customers in Massachusetts alone across more than 60 communities.

Adding to this period of change, uncertainty and transition are the effects from the Covid-19 Pandemic and DPU-ordered work restrictions that have combined to significantly impact CMA's work processes.

To its credit, CMA has accomplished several items related to safety since late-April, which is the beginning of the time period of the Monitor's engagement. For example, NiSource submitted to the DPU, on CMA's behalf, an updated and improved Emergency Preparedness and Response Plan (EPRP). The company has also implemented system-wide training on its SMS Learning Map as well as other technical training. Additionally, CMA is expending efforts to respond to the recommendations from recently issued external reports that are discussed later in this report. These external reviews include the Blacksmith Report, which CMA commissioned, the Dynamic Risk Report commissioned by the DPU, and the development of a safety assessment matrix for the transition to Eversource Energy. Also, CMA has reported that it has taken corrective actions following recent dig-in incidents such as holding safety stand-downs and retraining employees. Finally, and most notably, NiSource has quickly appointed a replacement for the imminent departure of CMA's current President and COO with a highly experienced and qualified executive noted for his passion and effectiveness of implementing safety. The initial impression by the Monitor of this appointment is that it is a positive development for CMA and a compatible pairing with the company's current Chief Executive Officer who was brought in from NiSource last year to guide CMA through its transition.

Regardless of the impending sale to Eversource Energy, the Monitor understands that NiSource – as CMA's current parent – is aware that it remains responsible for ensuring CMA's safety during the transition. As stated in the NiSource press release dated February 26, 2020, *"Until the close of the transaction, which is expected to occur by the end of the third quarter 2020, NiSource will continue to remain focused on driving customer safety and service at Columbia Gas, as well as continuing to make ongoing enhancements in all areas of operations going forward."* The Monitor team believes that CMA – like any organization – can endure through this transition if it has a positive safety culture that is achieved through effective leadership. Leadership sets the tone for the company regarding safety. The ongoing actions of NiSource and CMA leaders must provide the proof -- applied time and time again -- to a dynamically changing organization to ensure the constant of safety is inviolable against all pressures.

<u>At this stage of its assessment, the Monitor team is encouraged by NiSource's assertions that it is aware of the potential for CMA's increased exposure to risk at this critical juncture, and that it intends to closely oversee all safety related operations.</u>

## 4.0  Scope of Monitor Work

The Plea Agreement and the Monitor Agreement make clear that the Monitor "shall oversee CMA's compliance with the NTSB recommendations" related to the agency's Merrimack Valley Investigation. The NTSB issued a total of five recommendations to CMA's parent company NiSource during the investigation.  The first four recommendations were issued on November 15, 2018 -- two months after the Merrimack Valley accident -- and were classified as "urgent". These four recommendations have since been classified by the NTSB as "Closed – Acceptable Action". The fifth and final NTSB recommendation was issued to NiSource during the adoption of the NTSB's final accident report on October 24, 2019. This recommendation addresses emergency response and is currently classified as "Open-Acceptable Response" by the NTSB with regard to NiSource's action. The Monitor team's work and observations to date regarding each of the five recommendations is presented in Section 6.1 of this report.

The Monitor notes that the NTSB issued its recommendations to NiSource; however, the Court, through the Plea Agreement, has tasked the Monitor to focus on CMA's compliance with the recommendations. This situation has presented a challenge to the Monitor because CMA's compliance and leadership remains intertwined with NiSource management policies and executive directives. The Monitor team has required a considerable amount of time to sort out the structure and impact and this relationship. As a result, the Monitor team has not had the opportunity to focus solely on CMA, because of the time expended to understand the impact and intricacies of CMA's connectivity with NiSource. For example, NiSource has been the driver and decision-maker with regard to CMA's leadership changes since the Merrimack Valley accident, and an effective safety culture is dependent upon leadership. However, the Monitor team has made significant progress in understanding how, and to what degree, NiSource's has influenced CMA's implementation and benefits of a Pipeline Safety Management Systems (SMS).

The Plea Agreement also states that the Monitor will oversee CMA's compliance with the "applicable laws and regulations" associated with the issues addressed by the NTSB's five recommendations. As detailed in the Work Plan, the Monitor team conducted a comprehensive review and identified the specific Federal Code and Regulations[8] applicable. The Commonwealth of Massachusetts also has its own applicable code of regulations that are enforced by the Massachusetts Department of Public Utilities (DPU).[9]

Additionally, as per the Monitor Agreement, the Monitor team consulted with the U.S. Attorney's Office who in turn relied on expertise from the staff of the Pipeline Safety Division of the Massachusetts DPU. During those consultations, four suggested areas for Monitor examination were conveyed: Process Safety; Compliance with CMA Procedures; Field Oversight; and Damage Prevention. The Monitor has incorporated these four areas into its Work Plan as they align with the Monitor's role in overseeing CMA's compliance with the NTSB's recommendations and the applicable Federal and State laws and regulations.

Finally, the Monitor agreed to assess CMA's safety culture and SMS in all areas of the Monitor's compliance work. The NTSB's final report of the Merrimack Valley accident addressed the importance of safety culture in pipeline operations. This sentiment was supported and reiterated by all parties involved in the Plea Agreement. The Monitor team's work and observations regarding Safety Culture and SMS is presented in Section 6.3 of this report.

## 5.0 Activities Conducted by the Monitor

### 5.1 Preparation Prior to the Work Plan Effectivity.

As stated in Section 2.0 above, CMA requested James E. Hall of Hall & Associates LLC to begin its monitoring duties in late April 2020 in advance of, and in preparation for, the Monitor Agreement between Hall, CMA, and the U.S. Attorney that was signed on May 26, 2020. During this preparation period from late April 2020 until the beginning of the Monitor's first reporting

---

[8] The applicable Federal statute and the applicable rules derived from it are enforced by the Pipeline and Hazardous Materials Safety Administration (PHMSA). Their titles are: (1) U.S. Code Title 49 – TRANSPORTATION; Subtitle VII – PIPELINES; Chapter 601 SAFETY; Section 60118-Compliance and Waivers; and (2) 49 Code of Federal Regulations Part 192 *Transportation of Natural and Other Gas by Pipeline: Minimum Federal Safety Standards.*

[9] The titles of the applicable regulations for the Commonwealth of Massachusetts related to the NTSB's recommendations are (1) 220 Code of Massachusetts Regulations 101.00: Massachusetts Natural Gas Pipeline Safety Code; and (2) 220 Code of Massachusetts Regulations 107.00:   Abandonment of Gas Service Lines and Leakage Survey Procedures. These regulations are enforced by Massachusetts Department of Public Utilities (DPU).

period (July 1, 2020), the Monitor submitted four requests to CMA for documents and reviewed over 7,000 pages of information. Documents from the NTSB, the Massachusetts DPU, the U.S. Attorney and others were also obtained. (Additional documents were requested and received in July as discussed in the next section.) The Monitor inventoried and reviewed these documents to inform the development and content for a work plan that was required within 30 days of the Monitor Agreement. The Monitor submitted its first Semiannual Work Plan to the Court on June 26, 2020. The Monitor and his team also participated in teleconferences with government officials and company officials during this time to ensure an organized effort to initiate an effective Monitorship.

## 5.2 Work Plan Activities Conducted to Date

### 5.2.1 Methodologies Employed

To initialize its tasking, the Monitor set out to become as familiar as possible with the current operations and policies of CMA and its interconnection with NiSource.  This involved requesting and reviewing documents and conducting interviews of NiSource and CMA managers and executives. These activities have occurred in a challenging environment. The Covid-19 pandemic and government issued stop-work orders have resulted in a significant reduction of customer-facing and non-essential work for CMA. These factors have combined to significantly reduce the Monitor's opportunities to observe and monitor CMA work, and communicate directly with their workforce. To date, all documents and queries have been managed electronically and all interviews have been conducted via videoconferencing.  Despite these challenges, the Monitor team has made good progress with identifying specific CMA activities to audit as well as potential areas of concern that are referenced later in this report and will be explored in greater detail in later reports.

All five NTSB recommendations that the Monitor has been tasked to oversee are inter-related to some degree and share many common processes. Because of this, the Monitor has been performing its assessment of compliance with most recommendations simultaneously. The Monitor team is currently inventorying past and current CMA work activities relevant to the NTSB recommendations on all of its distribution systems.   Once the Monitor selects a suitable activity to monitor, it will review CMA's Operations and Maintenance (O&M) manual, select processes conducive for monitoring, and trace the project across most, if not all, of the recommendation areas simultaneously. The diagram below provides a graphical representative of this methodology:



### 5.2.2 CMA Documents and External Reports Reviewed

In total, to date, the Monitor team has submitted 9 bulk requests for CMA documents and received over 350 files totaling over 10,000 pages.  The Monitor team has cataloged each of these documents onto a spreadsheet for expedient cross-indexing.  The files include items such as: Organizational Charts; Operating and Maintenance Manuals; Distribution and Integrity Management Plan; NiSource Safety Management Systems (SMS) Standard and Process Documentation; Safety Performance Goals and Metrics for CMA/NiSource Leadership; DPU and CMA guidance regarding operational restrictions; Records related to any outstanding active investigations or consent orders issued by local, State or Federal jurisdictions within the past 3 years; Records of inspections and safety audits; Gas Standard GS 2810.050 ("Stakeholder Reviews"); and GS 1680.010 ("Tie-Ins and Tapping Pressurized Pipelines").

Additionally, since the beginning of the Monitor's tasking, three key external reports have been published.  The Monitor team has conducted a comprehensive review of these documents in order to inform its work and provide intelligence for specific issues to follow.  A summary of these three reports is provided as follows:

- The "Dynamic Risk" Report — On June 22, 2020, Dynamic Risk Assessment Systems, Inc. issued a report entitled *"Independent Assessment of Columbia Gas of Massachusetts' Merrimack Valley Restoration Program."*  The 149-page report was commissioned by the Massachusetts DPU and identifies the impact of certain decisions made to expedite CMA's restoration work from the Merrimack Valley accident. The assessment identifies gaps and opportunities for CMA and its successor to close the gaps over time.  Six recommendations to CMA were issued along with several to the DPU and CMA's successor company. The comprehensive report was supported by evidence that the Monitor team intends to utilize as it continues its work by tracking the report's findings and recommendations.

- The "Blacksmith Report" — On June 29, 2020, The Blacksmith Group issued a report entitled *Northeast Gas Association (NGA) Pipeline Safety Management System Assessment.* This 36-page report was commissioned by CMA in November 2019. The report's objective was to assist NGA members like CMA in conducting a conformance analysis of the requirements of API Recommended Practice 1173, *Pipeline Safety Management Systems,* as compared to their existing policies, programs, procedures, and practices. The results of the review and evaluation by Blacksmith indicated that CMA implemented many of the requirements of API Recommended Practice 1173. The findings in the report appear to be based mostly on interviews conducted on November 11-12, 2019.

- Settlement Agreement / Joint Petition: Appendix 1 – Safety Risk Assessment. On July 2, 2020, CMA and its holding company parent, NiSource, along with Eversource Energy, the Massachusetts Attorney General's Office, the Massachusetts Department of Energy Resources, and the Low-Income Weatherization and Fuel Assistance Program Network executed a Settlement Agreement pertaining to the proposed sale of CMA by NiSource for acquisition by Eversource.  Appendix A of the document provides a 13-page matrix listing of 32 "areas of focus" related to safety that Eversource must complete within the next 6 to 15 months, depending on the complexity of the task.[10]

---

[10] One of the areas of focus is entitled: "Procedures and Standards, NTSB Recommendations"  and is classified as "Priority: 2" on a scale of 1 to 3.  The entry states that Eversource will "review and compare of NiSource procedures and standards to Eversource's counterpart."  The review will include the work design, constructability reviews/approvals, PE certification, live gas procedures/drawings, work execution and close-out." It will also "validate that NTSB recommendations are addressed" and  "whether MOC procedures contain prescriptive and clear requirements in the MOC beyond the NTSB

### 5.2.3 Interviews Conducted

The Monitor began its work by first obtaining the perspectives of the senior leadership and management of CMA and its parent company NiSource. The Monitor team completed 14 structured interviews of these individuals who were selected and prioritized in a manner to obtain the most appropriate information necessary to meet the demands of the Monitor's tasking by the Court. The interviews were coordinated in advance through the CMA Liaison. Questions for the interview were prepared in advance by the Monitor team and tailored to the interviewee.  While some of these people will be interviewed again, the Monitor is now scheduling interviews with mostly subordinate employees and the "rank and file" who are implementing the policies and vision of the executives at the front lines of CMA's services. The Monitor considers their perspectives to be invaluable with regard to the effectiveness of CMA's implementation of the NTSB recommendations and also with Safety Culture.

Because of the Covid-19 pandemic, all interviews conducted to date took place via "Zoom" videoconference hosted by the Monitor. However, as stated in its Work Plan, the Monitor may request that interviews are conducted in person if the conditions allow.  Persons who held the following positions were interviewed during the reporting period:

*Persons from CMA*
- Chief Executive Officer
- President & Chief Operating Officer
- Appointed COO effective Aug. 1
- Vice President & General Manager
- Director of Field Operations
- Director, Construction
- Safety Advisor
- Manager, CMA Lawrence Operation
- Director,Safety, Compliance & Risk Mgmt

*Persons from NiSource*
- Chief Executive Officer
- Executive VP, COO & President
- Senior VP & Chief Safety Officer
- VP, Safety Mgmt. & Engineering
- VP, Construction & Engineering Services

*Persons External to CMA/NiSource*
- Director, DPU Pipeline Safety Division

### 5.3 Recent Safety-Related Events Under Review by Monitor

On July 1, 2020, CMA notified the Monitor of the discovery of several inaccurate and incomplete regulator station drawings. According to CMA records, on June 18, 2020, a third-party contractor discovered that an isometric drawing did not match the physical facility. Specifically, the control lines inside the enclosure were not mapped correctly. After the contractor notified CMA, the company compared isometric drawings to photographs of seven additional stations. All seven contained varying levels of discrepancies. The deficiency of incomplete documentation and mapping arose during the NTSB's investigation into the Merrimack Valley accident in September 2018, and again in a release of natural gas one year later. As a result of the Merrimack investigation, the NTSB issued recommendation no. P-18-007 which recommends that NiSource *"Review and ensure that all records and documentation of your natural gas systems are traceable, reliable, and complete."* The NTSB classified this recommendation as "Closed-Acceptable Action" in July 2019 based on NiSource

recommendations." The item indicates an estimated time to completion of 6 to 9 months.  It also cites the specific types of outputs or work products that will be required to be presented for review.

correspondence and meetings.[11] Due to the close relationship of this incident with P-18-007, the Monitor issued an "Alert Report" to the Committee on June 30, 2020, out of an abundance of caution to further the intent of the Monitor's Work Plan.

Additionally, during this reporting period and the weeks leading up to it, several recent safety related incidents occurred that prompted the Monitor's attention and concern. As discussed in the next section, the Monitor intends to follow up on some of the activities surrounding these events. A summary of these events is provided below in chronological order:

| Date and Location | Description of Event | Cause(s) of Event (and Source) |
|---|---|---|
| March 17, 2020 Brockton (Addison Ave) | In responding to a Grade 1 leak, CMA crew struck and damaged the service to a home with a backhoe. | Inadequate records; use of backhoe within 21-inch zone (Source: CMA) |
| March 31, 2020 Chicopee (Olivine Reg Station) | Low pressure system outage resulting from activation of slam shut device in the regulator. | M&R technicians did not properly follow CMA company procedures. (Source: DPU) |
| April 20, 2020 Walpole (Walpole Park S) | In responding to a Grade 1 leak, CMA crew struck an unmarked/unmapped gas service fusion with a backhoe. | Poor Records; No record of service lines (Source: CMA) |
| May 20, 2020 Bellingham (Paul Road) | In responding to a Grade 1 leak, CMA crew struck damaged a mismarked gas service to nearby a home while excavating. | Service was incorrectly mapped. Primary causes cited: "poor records;" lack of tracer wire; other means of ID not used (Source: CMA) |
| June 8, 2020 Springfield (Elaine Circle) | 3rd party damage to a ½-in. line as contractor dug to install drainage pipe. Locator unable to access SLR at site. | Poor field access to SLR data; Locator error (Source: CMA) |
| June 17, 2020 Andover (Brady Loop) | 3rd party (water contractor) struck partially inserted service line. CMA locator signal jumped to nearby water service. | Service line record did not properly capture original measurements; No service line record on file of later replacement.(Source: CMA) |
| July 9, 2020 Lawrence (Oak Street) | CMA contractor struck and damaged an unmarked 1.25-in. service stub 13 feet away from the 3-in. gas main. | Poor legacy records; Underground facility not marked (Source: DPU Notification) |
| July 14, 2020 Norton (Leonard Street) | 3rd party contractor struck a 2-in. plastic gas main with a 330 excavator while digging new water line. | Site was properly marked (Source: DPU Notification) |
| July 17, 2020 Taunton (County Road) | 2nd party contractor installing a service line struck a 1/2-in. plastic line during excavation. Gas flow stopped via limiter. | Inadequate facility locate of an adjacent service line. Site not properly marked. (Source: DPU Notification) |
| July 21, 2020 Marsden (Plymouth Ave.) | 3rd party (telecommunications) struck 4-in. gas main while auguring to install new pole. | Initial DPU notification form indicates that site was properly marked. CMA investigating. |

## 6.0 Assessment and Observations of Monitor's Work to Date

### 6.1 Compliance with NTSB Safety Recommendations

The NTSB issued four Safety Recommendations to NiSource that were classified as "urgent" as conveyed in NTSB Report Number PSR-18-02, *Natural Gas Distribution System Project Development and Review*, published on November 14, 2018.  The NTSB decisions to close all four recommendations were based on the letters received from NiSource, a review of CMA Gas

---

[11] In its May 2019 response to the NTSB for this recommendation, NiSource stated that it had "completed locating, marking and mapping of control (regulator-sensing) lines at all 2.072 low-pressure regulator runs across its seven-state footprint."

Standards GS 1680.010 and GS 2810.050; a report by TRC entitled *Report on Compliance with NTSB Recommendation Item #2 Material Verification Records* dated April 7, 2019, and presentations by NiSource officials during meetings held at NTSB headquarters in Washington, DC in December 2018 and April 2019. The NTSB did not conduct any audits or site visits to observe NiSource/CMA work processes nor did it request or examine any additional documentation that would be generated in accordance with the requirements of GS 1680.010 or GS 2810.050. Additionally, no CMA officials participated in the discussions with NTSB regarding the closing of these recommendations. The fifth recommendation (P-19-018) was issued about one year later when the NTSB published their final report of the Merrimack Accident. That recommendation addressed Emergency Response and remains open.

All five recommendations are presented in full below, followed by a summary of the Monitor team's progress and review to date:

### 6.1.1 NTSB Recommendation No. P-18-006

Revise the engineering plan and constructability review process across all of your subsidiaries to ensure that all applicable departments review construction documents for accuracy, completeness, and correctness, and that the documents or plans be sealed by a professional engineer prior to commencing work. (Urgent) -Classified "Closed-Acceptable Action" on October 24, 2019.

In its final report on the Merrimack Valley accident that was adopted on October 14, 2019, the NTSB declared that *"The development and implementation of GS 2810.050, including the requirement that construction documents and plans be sealed by a P.E., satisfies Safety Recommendation P-18-6 which is classified as 'Closed – Acceptable Action.' "* The NTSB did not perform a detailed review of any documents that would be required as per GS 2810.05 for a sample of capital projects; however, NiSource did provide an example of what a P.E. sign-off looked like.

The universe of activities available for review by the Monitor has been constrained because of Covid-19 work limitations and DPU-imposed work limitations. Nonetheless, the Monitor has identified and requested work activity documents from CMA to identify ongoing maintenance and compliance activities, incidents such as dig-ins, encroachments, leak repairs, inspections, training certification/qualification, and pipeline replacement projects dating from the 2016 gas mains replacement program. Upon receipt of the requested documents, the Monitor team will employ its developed processes to verify the alignment of actual work performed with CMA's standards and applicable Federal and state regulations. The Monitor will request that CMA certify that the completion of selected CMA activities have met its requirements. The Monitor team will then audit a subset of the documents to verify that the actual work was conducted in compliance with NiSource/CMA standards as described in GS 1680.010, GS 2810.050 and applicable Federal and State rules and regulations.

### 6.1.2 NTSB Recommendation No. P-18-007

Review and ensure that all records and documentation of your natural gas systems are traceable, reliable, and complete. (Urgent) - Classified "Closed-Acceptable Action" on July 22, 2019.

NiSource claimed in a May 10, 2019 letter that *"it had completed locating, marking and mapping control (regulator-sensing) lines at all 2,072 low-pressure regulator runs across its system,"* including the 222 runs at CMA. NiSource stated that these facilities are depicted in isometric drawings and are visible in its Geographic Information System (GIS). In addition,

9

NiSource contracted with a third-party natural gas engineering firm to *"verify the assets required to safely operate its low-pressure natural gas systems and ensure that these assets are clearly indicated on relevant maps and records."* The NTSB did not conduct any site visits or review any exemplar isometric schematics of the regulator stations. In response to the NiSource letter, the NTSB declared that this recommendation was classified "Closed – Acceptable Action" in a July 22, 2019 letter.

The Monitor has reviewed TRC's *Report on Compliance with NTSB Recommendation Item #2 Material Verification Records* [for NTSB Recommendation P-18-07] dated April 7, 2019.  The TRC report stated that: *"The first (of 2 projects performed by TRC) was to physically review the piping and sensing lines at each low pressure regulator station to accurately produce schematics of the location and layout of the facilities."* and that: *"The results of this project are detailed isometric schematics of the piping and major equipment and for the most part lengths of each sensing line from their originating regulator to their tie-in to the piping."* The Monitor notes that the TRC report is a summary which claims to have evaluated all NiSource low pressure regulator stations, or at least the sensing lines associated with them.

The Monitor has interviewed NiSource personnel who met with NTSB staff regarding the closing of this recommendation. The Monitor was advised that while the language of the recommendation was broad (i.e. *"Review and ensure that all records and documentation of your natural gas system are traceable, reliable and complete."*), the focus of the TRC effort and the response to NTSB was principally on the sensor lines associated with the low pressure regulator stations. A single "representative sample of schematic" is included in the 26-page TRC report.

Last month, on June 26, 2020, a representative of CMA's parent company, NiSource, verbally notified the Monitor of the discovery by a CMA contractor of inaccurate, unsigned and undated drawings of regulator stations within CMA.  The Monitor immediately requested records and documents associated with this issue and issued an Alert Report to the Committee as previously mentioned.  The Monitor has also been advised of an encroachment and gas release on July 9, 2020 and has requested records and documents associated with this event.

>    6.1.3 <u>NTSB Recommendation No. P-18-008</u>
>        Apply management of change process to all changes to adequately identify system threats that could result in a common mode failure. (Urgent) -- *Classified Closed-Acceptable Action" on October 24, 2019.*

In its October 14, 2019 accident report, the NTSB concluded that:
>    "NiSource improved its MOC process by developing and using Gas Standard 1680.010, 'Tie-Ins and Tapping Pressurized Pipelines,' and NiSource now requires the use of a written tie-in plan template.  As a part of its PSMS development activities, NiSource initiated asset review and probabilistic risk assessments that focus on improving risk analysis, identification and mitigation.  NiSource also developed and implemented an MOC procedure for its construction employees and contractors that details the steps needed to ensure safety on a project during change in personnel."

The Monitor team verified that neither the NTSB accident report nor any of its correspondence with NiSource discuss explicit evidence of a functional MOC process.  The Monitor notes that the only reference to "management of change operations" in GS 1680.010 is this statement on page 1: *"The phrase 'management of change operations' has been introduced as a way to explain tapping and tie-in operations."* However, the Monitor notes that this phrase does not

appear in the "Tie-in Plan Template." The NTSB determined to classify this recommendation as "Closed – Acceptable Response" at the time of the adoption of its final accident report.

The Monitor team has carefully examined GS 1680.010, GS 2810.050, the NiSource SMS Standard, the *Independent Assessment of Columbia Gas of Massachusetts' Merrimack Valley Restoration Program* performed by Dynamic Risk, and other documents to identify evidence that robust MOC processes and procedures are being applied at CMA in accordance with the guidance of API Recommended Practice 1173. The Monitor team has also interviewed executives of NiSource and CMA, and has specifically inquired about the MOC process at NiSource and CMA. None of the officials interviewed to date have been able to identify a written MOC procedure promulgated by either NiSource or CMA, nor have they been able to clearly identify the office or official responsible for the management of such a procedure. The Monitor will continue to seek documentation of the application of a formal MOC process to changes of technology, equipment, procedure and organization as per API Recommended Practice 1173.

The Monitor team has also identified the processes and recurrent meetings in which CMA/NiSource receive, catalog, discuss and mitigate risk. The Monitor will continue to aggressively research and assess how CMA evaluates and mitigates hazards.

> 6.1.4 NTSB Recommendation No. P-18-009
>> Develop and implement control procedures during modifications to gas mains to mitigate the risks identified during management of change operations. Gas main pressures should be continually monitored during these modifications and assets should be placed at critical locations to immediately shut down the system if abnormal operations are detected. (Urgent) - *Classified "Closed-Acceptable Action" on July 22, 2019.*

A summary of NTSB's response to NiSource's May 2019 letter to NTSB states:
> "NiSource said that it has made 'significant' enhancements to its tie-in and tapping procedures, including risk assessments, thorough checklists, and the development of contingency plans. NiSource also said that it was installing automatic pressure-control equipment and remote monitoring devices on every low-pressure natural gas distribution system across its operating area."

The correspondence between NiSource and NTSB did not refer to the NiSource SMS Standard regarding MOC. The NTSB did not observe modifications of gas mains or request documentation of risk mitigation procedures. Instead, the NTSB relied on representations made in the NiSource correspondence and presentations. Nonetheless, NTSB determined that these steps claimed by NiSource were sufficient to classify this recommendation as "Closed – Acceptable Response."

The Monitor will review the recent gas release incident on July 9, 2020 in Lawrence, MA that was caused when a CMA contractor hit an unmarked gas stub resulting in an emergency gas release. The gas main replacement work being performed by the CMA contractor was to alleviate a planned encroachment of the gas main by a planned water main replacement project. This incident is currently under CMA/DPU review and is awaiting a post incident report. However, the Monitor believes that elements of all five NTSB recommendations can be evaluated concurrently with this incident analysis. All records, including pre and post engineering and construction will be compared to CMA standards and applicable rules and regulations for verification. Records have been requested to support the Monitor's review which, when complete, will serve as the template for other complex project reviews.

### 6.1.5 NTSB Recommendation No. P-19-018

Review your protocols and training for responding to large-scale emergency events, including providing timely information to emergency responders, appropriately assigning NiSource emergency response duties, performing multi-jurisdictional training exercises, and participating cooperatively with municipal emergency management agencies. - *Classified "Open-Acceptable Action"*

This recommendation was issued concurrently with the NTSB final report on the Merrimack Valley accident adopted on October 24, 2019.  The most recent correspondence from NiSource to NTSB regarding this recommendation was dated December 23, 2019.  The NTSB responded in a letter from NTSB Chairman Robert Sumwalt on May 10, 2020 stating that this recommendation is classified as "Open – Acceptable Response."

As part of an annual requirement with the DPU, CMA/NiSource submitted an updated document to the DPU on May 15, 2020 entitled: *Columbia Gas of Massachusetts Emergency Preparedness and Response Plan (EPRP) 2020.* According to CMA representatives, this updated plan has not been submitted to NTSB. The Monitor team is continuing to closely review the updated EPRP plan.  In its evaluation of the July 9, 2020 encroachment and gas release in Andover cited above, the Monitor intends to evaluate documentation and interview contract personnel in order to verify the correctness and completeness of the emergency response.  A similar review of other events will also be performed going forward.

## 6.2 Compliance with Applicable Laws and Regulations

As indicated previously, the Monitor team has identified and requested work activity documents from CMA that relate to currently ongoing maintenance and compliance activities, incidents such as dig-ins, encroachments, leak repairs, inspections, training certification/qualification and to work surrounding pipe line replacement projects still ongoing dating from the 2016 gas mains replacement program.  Upon receipt of requested documents, the Monitor will employ its own processes to verify the alignment of actual work performed with NiSource/CMA standards as described in GS 1680.010, GS 2810.050 and applicable Federal and State rules and regulations.  The Monitor will ask CMA to self-certify compliance with these standards and regulations, and then audit a subset of these documents to ensure compliance.  This process will assess risk-based process safety, compliance with CMA procedures, field oversight, and execution of damage prevention in the work activities carried out by CMA.

## 6.3 Safety Culture and Safety Management Systems (SMS)

Safety Culture is the embodiment of an organization's values, beliefs, attitudes, norms and practices as it relates to safety and risk. The expectations that lead to a positive safety culture are created at the top of the organization.  Leadership enables success by their constancy of purpose, selfless and continuous adherence to what they profess, the allocation of resources, the alignment of goals within the organization, and by a strident unwillingness to compromise. A strong safety culture is the "glue that binds" people together toward a goal that is larger than themselves.

The NTSB's final report of the Merrimack Valley accident addressed the importance of safety culture in pipeline operations. This sentiment was supported and reiterated by all parties involved in the Plea Agreement.  Additionally, the Monitor recognizes the impact of safety culture on the prevention of accidents and incidents in all operational modes. The Monitor also recognizes that safety culture is an aspect that is interwoven into the issues addressed in all five of the NTSB's recommendations.

12

The Monitor has begun, in earnest, to assess CMA's safety culture in all areas of company operations. The Monitor team has been referencing API Recommended Practice No. 1173 *Pipeline Safety Management Systems,* as well as NiSource's SMS Standard used by CMA for this work. To this end, the Monitor has interviewed 14 NiSource and CMA managers and executives to date. (Interviews with "rank and file employees" are scheduled to begin in August). With respect to safety issues, every interviewee has been asked the same questions related to safety culture. The responses thus far suggest potential areas for further review, such as:



- With respect to the *"Are all accidents and incidents preventable ?"* question, one response indicated "no", two more responses conveyed a middle ground of "yes" with qualifications, and the remainder responded with an unqualified "yes".

- When asked to "define a positive safety culture" no two answers were the same. This is an indication of possible confusion and misunderstanding about the safety objectives at CMA.

- Item 2.1.1.2 of NiSource's SMS Standards document defines accountability as "Person ultimately answerable for the correct and thorough completion of work". However, the Monitor team's interviews have not yet pointed to evidence that an accountability policy for CMA exists, which precludes the inclusion of, and understanding for the consequences for, failed accountability. The Monitor is continuing to pursue documents and policies in this area.

The Monitor team's review of CMA documents to date have revealed additional areas for further review. For example, the following observations were noted:

- Cash-based incentive awards for the officer participants at NiSource and CMA are based on a formula tied to 75% for corporate financial performance and 10% for safety. This could send mixed signals to employees regarding the companies' actual primary objectives.

- A NiSource Cultural Assessment of CMA conducted an employee survey in November of 2019. The survey asked 64 employees at CMA's Springfield operation about six elements of culture including embracing change, shared accountability, and non-punitive risk reporting. Employees could vote that the element was a company "strength," a "weakness" or "neutral." The results indicated that across the spectrum of all six categories of elements, 65% provided "weakness" or "neutral" responses. However, the company assessment stated: *"Overall, the assessment team notes that CMA has a safety culture that supports all of the elements outlined in the NiSource Assessment guide."*

- An analysis of CMA safety performance data as measured by standardized OSHA reporting for employee injuries for 2018 and 2019 showed an average of 24.5 recordable injuries for each of those two years for an average incident rate of 3.44. The May 2020 year-to-date data indicates that the number of injuries has been reduced to 5 for a rate of 1.96. No information regarding contractor performance in these categories has been identified yet.

The Monitor will continue to seek to understand the issues relating to safety culture and SMS at CMA as it relates to performance. A clear and common understanding of a company's safety culture is fundamental to its success.

**7.0 Moving Forward: Planned Activities for Monitor Team**

The Monitor and his team plan to perform the following activities during the month of August:

- Interviews to be scheduled for August and September:

As mentioned previously, the Monitor is now scheduling interviews with the "rank and file" who are implementing the policies and vision of the executives at the front lines of CMA's services. The Monitor considers their perspectives to be invaluable with regard to the effectiveness of the implementation of the NTSB recommendations and corporate safety culture.

*Persons from CMA*
- Manager, Damage Prevention
- Manager, System Operations
- Manager, LNG Facilities
- Union President: Lawrence (IBEW 326)
- Union President: Springfield (Steelworkers)
- Union President: Brockton (Utility Workers)
- Work Coordinators/Inspectors
- Senior Operations Supervisors
- M&R Technicians
- Locator/Mark Employees
- CMA Contractor Employees
- Certified Professional Engineers
- Manager of Human Resources
- Manager, CMA Lawrence Operation (2nd)
- Director, Safety, Compliance & Risk (2nd)
- State SMS Leads

*Persons from NiSource*
- VP, Emergency Management
- VP, Safety Management & Engineering  (2nd)
- Manager, NiSource/CMA Control Center
- Certified Professional Engineers

*Persons External to CMA/NiSource*
- Mayor, City of Lawrence
- Town Managers, Andover & North Andover
- First Responders/Incident Commanders
- Authors of TRC Report dated April 7, 2019
- National Safety Council Advisor for SMS
- Advisor(s), Dynamic Risk Reports
- Director, DPU Pipeline Safety Division

- Site Visits

The Monitor hopes to conduct site visits as part of its duties as conditions allow next month. A site visit will involve one or more persons from the Monitor's team travelling to observe operations, interact with employees, and document aspects of the area visited. Proposed site visits to CMA offices and/or facilities will be coordinated in advance through the CMA Liaison. Examples of site visit locations and activities include, but are not limited to the following:
- Regulator stations
- Construction sites
- Engineering Offices
- Committee Meetings
- Control Centers

- Document Review and Verification Activities

As indicated in Section 6 above, the Monitor team has identified and requested work activity documents from CMA that relate to currently ongoing maintenance and compliance activities, incidents such as dig-ins, encroachments, leak repairs, inspections, training certification/qualification and to work surrounding pipe line replacement projects still ongoing dating from the 2016 gas mains replacement program.  Upon receipt of requested documents, the Monitor will verify the alignment of actual work performed with NiSource/CMA standards as described in GS 1680.010, GS 2810.050 and applicable Federal and State rules and regulations.  The Monitor will ask CMA to self-certify compliance with these standards and regulations. The Monitor will then audit a subset of these documents to ensure compliance.

14

The Monitor team will also evaluate documentation and interview contract personnel in order to verify the correctness and completeness of the emergency response.  A similar review of other events will also be performed going forward.

The Monitor will review the recent gas release incident on July 9, 2020 in Lawrence, MA. The Monitor believes that elements of all five NTSB recommendations can be evaluated concurrently with this incident analysis.  All records, including pre and post engineering and construction will be compared to CMA standards and applicable rules and regulations for verification. Records have been requested to support the Monitor's review which, when complete, will serve as the template for other complex project reviews.

- <u>Next Monthly Report</u>

The Monitor's next Monthly Report for August is scheduled for submittal to the Committee on Friday, August 28, 2020.

------   END   -------

## Appendix A:

### Biographies of the Monitor

## Monitor Team
### for Columbia Gas of Massachusetts

**James E. Hall**
Managing Partner, Hall & Associates

Jim Hall is a leading expert in crisis management and government relations, and transportation safety and security, having served government and private clients for more than five decades.



Mr. Hall began his career in Washington as a member of the staff of Senator Albert Gore, Sr. (D-TN).  He subsequently served as a counsel to the Senate Subcommittee on Intergovernmental Relations under Senator Ed Muskie.  He maintained a private legal practice in Chattanooga, Tennessee, before serving in the cabinet of Tennessee Governor Ned McWherter. Mr. Hall served as director of the state's Planning Office for five years.  As such he was responsible for overseeing the establishment of the Memphis Headquarters for FedEx, the internationally recognized shipping company.  In addition to overseeing this large initiative, Mr. Hall handled policy planning and special projects, including heading up planning for the State's Bicentennial Celebration.  It was Hall's initiative that resulted in the construction of the Bicentennial Mall in Nashville, one of the city's newest crown jewels.

Hall returned to Washington, D.C. to serve as Chief of Staff for Senator Harlan Mathews (D-TN). In 1993, Mr. Hall was nominated by President Clinton to be a Member of the National Transportation Safety Board, and to serve as its Chairman in 1994.  He led the Board through January 2001.

During his chairmanship, Mr. Hall worked tirelessly to improve safety in all modes of transportation in the U.S. and abroad. He visited more than 30 nations as Chairman, and oversaw a period of unprecedented activity as the NTSB investigated numerous major aviation, rail, pipeline and maritime accidents in the U.S. During his tenure on the Board, Mr. Hall also assisted in many international accident investigations. Among the major investigations the NTSB conducted while Mr. Hall was Chairman were the aviation cases of USAir 427, TWA 800, and EgyptAir 990; the Olympic Pipeline accident in Bellingham, Washington; the AMTRAK crash in Bourbonnais, Illinois; and a Carnival Cruise Line fire near Miami.  In 1996, President Clinton named Mr. Hall to the White House Commission on Aviation Safety and Security.

Under Chairman Hall's leadership, the NTSB issued landmark safety studies on commuter airlines, the air tourism industry, the performance and use of child restraint systems, personal watercraft, transit bus operations, passive-grade railway crossings and the dangers posed to children by passenger-side airbags in automobiles.

Hall has for many years been Vice Chairman of the Chattanooga Metropolitan Airport Authority.  Mr. Hall is a former member of the Board of Trustees at the University of Tennessee and the Board of the UC Foundation, and a former member of the Tennessee River Gorge Trust.  He was also the Chairman of the Enterprise Center in Chattanooga for eight years, a board member of U.S. Xpress Enterprises, and served on the National Academy of Engineering's Committee on Combating Terrorism and the Aviation Institute Advisory Board of George Washington University.  In addition, Mr. Hall served as a member of the External Advisory Board of BP America PLC.

These diverse experiences and responsibilities give him the ability to work with clients on a wide range of issues.  At Hall & Associates, Mr. Hall has surrounded himself with people who share his extensive knowledge on a broad range of issues, and he has created an environment conducive to helping our clients with whatever needs they have.

In addition, Mr. Hall serves as an adviser to governments and private clients on transportation safety and security, crisis management and government relations. He is a frequent speaker at industry events, an oft-quoted expert source by television and print reporters, and an author of numerous Op-Ed pieces. His columns have appeared in national publications such as *the New York Times* and *USA Today,* and regional newspapers like the Virginian Pilot in Norfolk.  He has appeared on virtually every major television news program, including *60 Minutes*, the *Today* show, *Fox Business Channel*, *BBC, MSNBC, CNN and CNBC*. In 2002, the U.S. Forest Service named Mr. Hall to co-chair a blue-ribbon safety review of the operations of firefighting aircraft after three such aircraft crashed that summer.

Mr. Hall has given congressional testimony before numerous House and Senate committees, including the House Committee on Transportation and Infrastructure (aviation and railroad subcommittees) and the Senate Committee on Commerce, Science and Transportation (transportation and surface transportation/merchant marine subcommittees).

Mr. Hall graduated from the University of Tennessee School of Law in 1967, following the receipt of a baccalaureate of legal letters degree from the undergraduate school. He also has an honorary degree in public service from George Washington University for his outstanding leadership and commitment to the public. He served as a commissioned officer in the U.S. Army from 1967 to 1973, receiving the Bronze Star for Meritorious Service in Vietnam in 1969.

**William D. Scott II**



Mr. Scott is a highly respected expert and consultant with over four decades of significant contributions to public and private firms in transportation, logistics, energy, alternative energy, utilities and consumer products manufacturing.  He has a proven track record as an executive and problem solver who has represented and advised Federal agencies regarding regulatory affairs and compliance for security, safety, transportation, and energy management issues.

As an expert with Hall & Associates for the past nine years, Mr. Scott has provided valuable expertise regarding pipeline operations and safety. For example, he consulted with Pacific Gas and Electric Co (PG&E) following the company's pipeline failure in San Bruno, California in 2010. His efforts contributed to recommendations and counsel to PG&E's Board of Directors and Executive Management to improve pipeline safety and create a robust safety culture, and he also assisted counsel for the California Public Utilities Commission.

Prior to consulting, Mr. Scott served as the president of Temple Mountain Energy in Vernal, Utah from 2007 to 2009.  He was elected by the Board of Directors as president to  launch the first-ever operational oil sands pilot plant in U.S., using innovative and proprietary technology to enable cost-effective and environmentally sensitive oil production.  From 2006 to 2007, he also served as the Vice President of Operational Excellence for Georgia Pacific, a Fortune 500 company headquartered in Atlanta, Georgia. There he was tasked to lead a board-driven 18-month strategic assignment to design a transformation plan to reconstruct global supply chain and logistics.

Mr. Scott was also previously employed by the Colonial Pipeline Company in Atlanta for nearly 10 years beginning in 1998, as a senior vice president and its Chief Operating Officer.  He was recruited by the CEO in a post-crisis climate to embark on an operational and cultural turn-around mission to reform operational errors, restore operational integrity, and raise value/equity. He directed senior managers and 550 employees in  the areas of operations, engineering, aviation, automation, control systems, safety/security, and training. Mr. Scott successfully led a cultural shift from entitlement and risk avoidance to accountability and risk management. He restored operational integrity at the company, reversing from worst to first for a no. 1 ranking industrywide.  Colonial received the Association of Oil Pipe Lines (AOPL) Award for Best Pipeline Company five times during his tenure – an accomplishment never before matched.  Mr. Scott himself also received an award from the U.S. Pipeline and Hazardous Materials Safety Administration (PHMSA) for industry leadership to advance the cause of pipeline safety.

Mr. Scott began his career with Conoco/Phillips -- the largest Integrated refining/marketing energy company in U.S – where he worked as a manager in marketing, business development, acquisitions and transportation from 1976 to 1998. During his 22-year tenure at Conoco/Phillips, Mr. Scott completed multiple domestic and international assignments with noted success. For example, he led a marketing team that won the President's Global Award for Safety.

Mr. Scott earned a B.A. in Management from Texas Tech University and a Masters Degree in Liberal Arts from Southern Methodist University.  He has held chairman and leadership positions with numerous high-profile industry committees and boards.

**Kevin B. Knapp**

Mr. Kevin Knapp has accumulated nearly four decades of technical and executive experience in the gas and electric industry. He has consistently proven to be an invaluable expert, collaborative leader and an agent for safety change in every position he has held in the industry.



Mr. Knapp began his career in 1973 as Field Inspector (IBEW) for Long Island Lighting Company (LILCO).  He progressed through First Line Supervisor and Manager for Gas Operations at LILCO before leaving in 1984 to accept the position as Chief Gas Distribution Engineer of Manhattan Gas Operations for Consolidated Edison. He returned to LILCO in 1990 as Division Manager of Gas Operations and was quickly promoted to Department Manager of Transportation and then to Department Manager of Gas Customer Service.

Because of his demonstrated ability to successfully resolve challenging issues, Mr. Knapp was then asked to lead LILCO's day-to-day merger efforts with Brooklyn Union Gas to form KeySpan Energy.  He later served a similar role in the merger with Eastern Enterprise. KeySpan is a regulated natural-gas utility holding company that operates in New York City, Long Island, Boston, and part of New Hampshire.  It is the fifth-largest gas utility in America and the largest gas utility in the Northeast, with about 2.6 million customers.

In 1999, Mr. Knapp served as the Director of Electrical Generation for the KeySpan Corporation and was quickly promoted to Vice President at KeySpan's Long Island Gas Operations in 2000. In 2002, Mr. Knapp was reassigned as the Vice President of Keyspan's New England Gas Operations and achieved success for each of the five years he was employed there.

Mr. Knapp was then appointed as the Senior Vice President of U.S. Supply Chain at National Grid in 2007 where he was responsible for U.S. Supply Chain activities including: Procurement & Accounts Payable ($1.5 billion); Inventory Management ($100 million); and Fleet Operations (10,000 units).

In March 2012, Mr. Knapp was named Vice President of Gas Transmission and Distribution Operations for the Pacific Gas and Electric Company (PG&E) in San Francisco, California.  He was responsible for the operations and maintenance on PG&E's gas transmission and distribution system, including leak survey and repair, corrosion testing/remediation, pipeline patrolling, and emergency response calls. Mr. Knapp was hand-picked for this assignment to help improve PG&E's operations and safety culture following the 2010 gas pipeline explosion in San Bruno, California.

Following numerous successful achievements at the company, Mr. Knapp retired from PG&E, relocated back to the northeastern U.S. and currently consults in the gas industry. Mr. Knapp earned a B.S. degree in Industrial Engineering from Hofstra University, and a M.S. degree in Industrial Engineering at Columbia Engineering.

**Jeffrey B. Guzzetti**

Molded by over 35 years of safety analysis and accident investigation experiences, Jeff Guzzetti has become a sought-after safety consultant, instructor, investigator, surveyor, and writer. Current activities include instructing at the University of Southern California (USC) Aviation Safety Program, conducting safety surveys of air ambulance operations for the Commission of the Accreditation of Air Transport Systems (CAMTS), writing articles related to safety culture in maintenance, and consulting with various transportation operations to improve safety.



Mr. Guzzetti began his career with the Federal Aviation Administration (FAA) in 1985 as an aerospace engineer at the FAA Technical Center's Aviation Safety Division in New Jersey. He later held positions in systems safety engineering for the U.S. Naval Air Systems Command and in air safety investigations with the Cessna Aircraft Company. While at Cessna, Mr. Guzzetti traveled to accident sites across the U.S. to assist FAA inspectors and National Transportation Safety Board (NTSB) investigators by providing technical expertise on all Cessna aircraft.

Mr. Guzzetti was then recruited by the NTSB in 1992 and worked in the agency's Office of Aviation Safety for 18 years -- first as a field investigator, then as a systems engineer for the NTSB "go-team," and later as an investigator-in-charge (IIC) of major accidents and incidents. He led key aspects of many notable investigations including the Alaska Airlines Flight 261 crash in California and the JFK Jr. Piper PA-28R accident. Mr. Guzzetti was then promoted to Deputy Director for Regional Operations in 2002 and was responsible for overseeing the NTSB's investigation of 1,600 general aviation accidents each year.

In August 2010, Mr. Guzzetti left the NTSB to accept an appointment as the Assistant Inspector General of Aviation and Special Program Audits at the Department of Transportation's (DOT) Office of Inspector General (OIG).  There he provided executive-level oversight of 90 auditors and staff at DOT Headquarters and three of its regional offices who conducted formal audits of programs that were overseen by the Pipeline and Hazardous Materials Safety Administration (PHMSA) as well as the FAA.  The "Special Programs" portion of his title referred to the entire portfolio of pipeline and hazardous material safety issues under the purview of PHMSA.

Mr. Guzzetti testified before Congress several times regarding transportation safety programs. He was responsible for the office's training, budget, and pipeline safety audit topic agenda. He represented the agency in all interactions with the PHMSA Administrator, his/her senior staff, and Congressional staff responsible for oversight and appropriations of PHMSA operations. Mr. Guzzetti was responsible for the issuance of 42 audit reports on PHMSA and FAA programs including a report entitled *PHMSA's State Pipeline Safety Program Lacks Effective Management and Oversight* issued in May 2014.

In 2014, Mr. Guzzetti accepted an offer to serve as the director of FAA's Accident Investigation Division. This division was responsible for ensuring the integrity of policies and practices for FAA inspectors assigned to investigate aircraft accidents and incidents, and it also functioned as the primary liaison with the NTSB.  The division employed an elite group of senior investigators to represent the agency in major air safety investigations worldwide. He retired from this position in February 2019.

Mr. Guzzetti earned a B.S. degree in Aeronautical Engineering from Embry-Riddle Aeronautical University in Florida. He is also a commercial-rated pilot with multi-engine instrument ratings in airplanes, seaplanes, and gliders.

**Vernon S. Ellingstad, Ph.D.**



Dr. Vern Ellingstad has extensive experience with national and international accident/incident databases in aviation, rail, highway, marine, and pipeline transportation modes, and the conduct of aggregate analyses of accident trends and causal factors.   He has significant experience in all phases of transportation accident investigation, with particularly strong experience in human factors issues including operator fatigue, operator workload, and safety culture.   Dr. Ellingstad also has extensive experience conducting statistical analysis of accident, survey, and outcome data in a wide variety of experimental, quasi-experimental, and observational research.   His experience also includes large-scale program evaluation and systems research and significant involvement in developing and advocating for recommendations to improve the safety and efficiency of transportation systems.

As Chief Technical Advisor for Investigations and Research at the National Transportation Safety Board (NTSB) from 2009 to 2012, Dr. Ellingstad conducted studies of transportation safety issues using both prospective and retrospective accident investigation data, and assessments of government and industry risk management and safety efforts.   He also provided scientific and technical review of most major accident reports issued by the NTSB and advised senior management on accident investigation and transportation safety policy issues, including those involving gas pipelines.

As Deputy Director and Director of the Office of Research and Engineering from 1990 to 2009, Dr. Ellingstad managed the NTSB laboratory and applied research facilities to support accident investigations and safety research in all transportation modes.   These facilities include the Materials Laboratory, the Vehicle Recorders Laboratory, and the Vehicle Performance Laboratory.   The Office of Research and Engineering also included the Safety Research and Statistical Analysis division, which manages the Board's census of U. S. civil aviation accidents, conducts statistical reviews of these data, and conducts both long- and short-term safety studies that explore significant safety issues.

As Assistant to Full Professor of Psychology at the University of South Dakota from 1969 to 1990, Dr. Ellingstad taught a variety of courses at the graduate and undergraduate levels and directed more than 30 Ph.D. dissertations and 40 M.A. theses.   He also administered the M.A. and Ph.D. programs in Human Factors Psychology, and managed the Human Factors Laboratory and solicitation and conduct of external research grants and contracts to support human factors research in this facility.   Personal Human Factors research efforts included studies of operator fatigue, studies of alcohol and drug effects on driving performance and risk taking, studies of motorcycle training and helmet use, and studies of a range of cognitive and human-computer interaction tasks.

Dr. Ellingstad also served as Chairman of the University of South Dakota Department of Psychology from 1986 to 1990 and Director of the South Dakota Research Institute from 1978 to 1982.

Dr. Ellingstad received his BA degree from the Wisconsin State University at Eau Claire and his M.A.) and Ph.D. degrees from the University of South Dakota.   He received the 1997 *Arthur S. Flemming* Award for outstanding men and women in the Federal Government (Applied Science) in 1998 and the U.S. Government Senior Executive Service *Presidential Rank Award* in 1999.